## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT McCULLOUGH, On Behalf of Himself and All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. |
| DUPONT FABROS TECHNOLOGY, INC., 401 9th Street NW, Suite 600, Washington D.C., 20004 | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| LAMMOT J. DUPONT, 401 9th Street NW, Suite 600, Washington D.C., 20004 | **JURY TRIAL DEMANDED** |
| CHRISTOPHER P. ELDREDGE, 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| MICHAEL A. COKE, 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| THOMAS D. ECKERT, 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| FREDERIC V. MALEK, 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| JOHN H. TOOLE, 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| JOHN T. ROBERTS, JR., 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| and | |
| MARY M. STYER, 401 9th Street NW, Suite 600, Washington D.C., 20004 | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Robert McCullough ("Plaintiff"), through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and the other public stockholders of DuPont Fabros Technology, Inc. ("DuPont" or the "Company") (other than Defendants outlined below), against the Company and its Board of Directors (the "Board" or "Individual Defendants") in connection with the proposed acquisition (the "Proposed Transaction") of DuPont by Digital Realty Trust, Inc. ("Parent") and its affiliates (collectively, "DLR").

2.      On April 23, 2017, the Board caused the Company to enter into a definitive merger agreement (the "Merger Agreement") with DuPont Fabros Technology, L.P. ("DFT OP"), Parent, Penguins REIT Merger Sub, LLC, Digital Realty Trust, L.P., Penguins OP Sub 2, LLC, and Penguins OP Sub, LLC, pursuant to which each share of DuPont's common stock will be converted into the right to receive 0.545 shares of Parent common stock (the "Common Merger Consideration"), and each share of DuPont's 6.625% Series C preferred stock will be converted into the right to receive one share of a newly created class of preferred stock of Parent (the "Preferred Merger Consideration"). Based on Parent's closing price on the last day of trading prior to the announcement of the Proposed Transaction, the Common Merger Consideration is impliedly valued at $64.32 per share.

3. In order to convince DuPont's stockholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a Form S-4 Registration Statement with the Securities and Exchange Commission on or about July 10, 2017 (the "Registration Statement").

In violation of Sections 14(a) and 20(a) of the Exchange Act, the Registration Statement contains incomplete and materially misleading information regarding: (i) the process leading to the Proposed Transaction; (ii) the financial analyses conducted by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), in connection with the Proposed Transaction; and (iii) the projections relied upon Goldman Sachs in performing its valuation analyses.

4.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to DuPont stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

6.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

**A.      Plaintiff**

8.      Plaintiff is, and at all relevant times was, a continuous owner of DuPont common stock.

**B.      Defendants**

9.      Defendant DuPont Fabros Technology, Inc. (previously defined as "DuPont") is a corporation organized and existing under the laws of the State of Maryland with its principal executive offices located at 401 9th Street NW, Suite 600, Washington D.C., 20004. DuPont is the sole general partner of DFT OP (DuPont's operating limited partnership), and, as of December 31, 2016, DuPont owned 84.9% of the common economic interest in DFT OP.

10.      Defendant Lammot J. du Pont ("du Pont") is a co-founder of the Company and has served as a director and as Chairman of the Board since 2007. Importantly, in addition to owning common stock in DuPont, Defendant du Pont also owns or has an economic interest in approximately 3,335,648 common units of DFT OP.

11.      Defendant Christopher P. Eldredge ("Eldredge") has served as a director of the Company and as DuPont's President and Chief Executive Officer ("CEO") since February 2015.

12.      Defendant Michael A. Coke ("Coke") has served as a director of the Company since October 2007.

13.      Defendant Thomas D. Eckert ("Eckert") has served as a director of the Company since October 2007.

14.      Defendant Frederic V. Malek ("Malek") has served as a director of the Company since October 2007.

15.      Defendant John H. Toole ("Toole") has served as a director of the Company since October 2007.

16.     Defendant John T. Roberts, Jr. ("Roberts") has served as a director of the Company since February 2011.

17.     Defendant Mary M. Styer ("Styer") has served as a director of the Company since May 2015.

18.     Defendants du Pont, Eldredge, Coke, Eckert, Malek, Toole, Roberts, and Styer form the Board of Directors of DuPont and are collectively referred to herein as the "Board" or the "Individual Defendants." Each of the Individual Defendants at all relevant times had the power to control and direct DuPont to engage in the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of DuPont (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable. As of July 6, 2017, there were approximately 77,845,588 outstanding shares of DuPont common stock.  The actual number of public shareholders of DuPont will be ascertained through discovery.

22.     Questions of law and fact are common to the Class, including, among others:

a.     Whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Registration Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b.     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c.   Whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A.   Background of the Companies

26.     DuPont is a real estate investment trust ("REIT") headquartered in Washington D.C. that owns, develops, operates, and manages large, multi-tenant data centers. DuPont's customers include national and international enterprises across numerous industries, such as technology, Internet content providers, media, communications, cloud-based, healthcare and financial services. The Company's 12 data centers total 3.5 million gross square feet and 301.5

megawatts of available critical load to power the servers and computing equipment of its customers.

27.    DLR similarly owns, acquires, develops, and operates data centers, and provides its services for domestic and international customers across a variety of industries. As of March 31, 2017, DLR owned 145 properties, including 3 properties held for sale and 14 properties held as investments in unconsolidated joint ventures, with approximately 25.5 million rentable square feet, including approximately 1.5 million square feet of space under active development and approximately 1.7 million square feet of space held for future development, located throughout North America, Europe, Asia and Australia.

**B.    Events Leading to the Proposed Transaction**

28.    Having operated in the same space for years, DuPont and DLR have previously evaluated and considered a variety of potential financial and strategic opportunities, most recently in 2014, when the companies engaged in preliminary discussions regarding a potential transaction and exchanged confidential information, but ultimately did not engage in any such transaction.

29.    Then, in March 2017, A. William Stein, the CEO of DLR, contacted Defendant Eldridge to discuss a potential business combination, after which DLR communicated a preliminary all-stock offer to acquire DuPont at an exchange ratio of between 0.51 to 0.53 shares of DLR common stock for each outstanding share of DuPont common stock. The offer contemplated that one member of the DuPont Board would join the DLR board. Defendant Eldridge responded that he did not believe that the DuPont Board would be interested in a transaction at that price.

30.     Thereafter, Defendant Eldridge spoke with Defendant du Pont regarding this offer, and both men spoke with the larger DuPont Board regarding the same, at which time the Board concluded that it would not be interested in a transaction on those terms.

31.     In late April, DLR transmitted a second offer, this time to acquire DuPont in an all-stock transaction at a fixed exchange ratio of between 0.52 and 0.53 shares of DLR common stock for each share of DuPont stock. This offer also noted a willingness to discuss providing a meaningful component of the merger consideration in the form of cash and reiterated that DLR was prepared to offer DuPont representation on the DLR Board, but did not specify a number of DuPont representatives.

32.     Although the Board again rejected this offer, it decided to continue exploring a potential transaction with DLR. In connection therewith, the Board formed a Special Committee (the "Special Committee"), comprised of Individual Defendants du Pont, Coke, Eckert, Malek, and Roberts, to facilitate the selection of a financial advisor.  Thereafter, and despite the fact that the Board had previously received financial advice regarding the DLR offers from another unnamed financial advisor, the Special Committee authorized Defendant du Pont to pursue the engagement of Goldman Sachs.

33.     At the direction of the Board, Goldman Sachs then communicated a counterproposal to DLR for a transaction pursuant to which DuPont stockholders would receive the equivalent of 0.56 shares of DLR common stock per share of DuPont common stock, with 35% of the consideration to be paid in cash and the rest to be paid in the form of DLR common stock.  On May 9, 2017, DLR responded with an offer for an all-stock combination at a fixed exchange ratio of 0.54 shares of DLR common stock for each outstanding share of DuPont common stock, in response to which DuPont counter-proposed an all-stock combination at an exchange ratio of 0.555 shares of DLR common stock for each outstanding share of DuPont

common stock.  And, on May 11, 2017, DLR responded with an offer for an all-stock transaction at a fixed exchange ratio of 0.545 shares of DLR common stock for each outstanding share of DuPont common stock.

34.     On this basis, the Board agreed to proceed with merger discussions with DLR on an exclusive basis. However, as discussion progressed, disagreements arose regarding certain terms, specifically including, but not limited to, the number of DuPont directors that would become DLR directors and a Tax Protection Agreement to which DFT OP unit holders – like Defendant du Pont – would be required to agree.  The Registration Statement fails to disclose the specific nature of this latter disagreement or any of the specific terms at issue in the several Tax Protection Agreement term sheets that the parties exchanged, despite the fact that any such tax treatment would have been material to Defendant du Pont (who, notably, served on the Special Committee) in light of his significant DFT OP holdings.

35.     Indeed, these disagreements were apparently material enough that, on two occasions between May 31 and June 4, 2017, Defendant du Pont contacted Mr. Stein and communicated that DuPont was not prepared to proceed with a transaction based on the positions taken by DLR regarding these issues and that, based on these positions, further negotiation would not be productive.  At one point, DuPont even went so far as to turn off access to the virtual data room being used by Parent for due diligence and deliver a "return or destroy" letter to Parent pursuant to the parties' confidentiality agreement.  Indeed, it was only after further emphasis by Defendant du Pont regarding the importance of these issues to DuPont that DLR revised its position on them – but those positions are never actually disclosed in the Registration Statement.

36.     Finally, with these undisclosed issues resolved, DuPont requested that an affiliate of Goldman Sachs provide DuPont with a commitment for a bridge loan facility, should DuPont

need additional financing prior to closing of the transaction, if closing was unexpectedly delayed. Despite acknowledging that such a facility could create potential conflicts of interest for Goldman Sachs, the Board ultimately approved both that bridge loan facility and the Merger Agreement on June 8, 2017.  Notably, the number of DuPont directors that would join the DLR board remained unresolved until at least June 7, 2017.

**C.**     **The Proposed Transaction**

37.     On June 9, 2017, DuPont and Parent issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

### DIGITAL REALTY TO MERGE WITH DUPONT FABROS

*Transaction to Enhance Digital Realty's Ability to Serve Top U.S. Data Center*

*Metro Areas Expands Hyper-Scale Product Offering and Solidifies Blue-Chip Customer Base*

*Immediately Accretive to Financial Metrics and Improves Balance Sheet Strength*

**SAN FRANCISCO and WASHINGTON, D.C. – June 9, 2017 –** Digital Realty (NYSE: DLR), a leading global provider of data center, colocation and interconnection solutions, and DuPont Fabros (NYSE: DFT) a leading owner, developer, operator and manager of enterprise-class, carrier-neutral, large scale multi-tenant data centers, announced today they have entered into a definitive agreement under which DuPont Fabros will merge with Digital Realty in an all-stock transaction. The consummation of the transaction is subject to customary closing conditions, including approval by the shareholders of Digital Realty and DuPont Fabros. Under the terms of the agreement, DuPont Fabros shareholders will recei 5 Digital Realty share per DuPont Fabros share, for a transaction valued at approximately $7.6 billion in enterprise value.

**Transaction Delivers Key Strategic and Financial Benefits**

- **Enhances Ability to Serve Top U.S. Metro Areas:** DuPont Fabros' portfolio is concentrated in top U.S. data center metro areas across Northern Virginia, Chicago and Silicon Valley. The transaction will help grow Digital Realty's presence in strategic, high-demand metro areas with strong growth prospects, while achieving significant diversification benefits for DuPont Fabros' shareholders from the combination with Digital Realty's existing footprint of 145 properties across 33 global metropolitan areas.

- 10 -

- **Expands Hyper-Scale Product Offering:** DuPont Fabros' 12 purpose-built, in-service data centers will significantly expand Digital Realty's hyper- scale product offering and improve its ability to meet the rapidly growing needs of cloud and cloud-like customers, in addition to enterprise customers undertaking the shift to a hybrid cloud architecture. Conversely, the transaction enables DuPont Fabros to address a broader set of customers' data center requirements, with the addition of Digital Realty's colocation and interconnection product offerings.

- **Solidifies Blue-Chip Customer Base:** DuPont Fabros' impressive roster of blue-chip customers will further enhance the credit quality of Digital Realty's existing customer base. On a combined basis, investment grade or equivalent customers will represent more than 50% of total revenue. The transaction also significantly reduces DuPont Fabros' customer concentration. The combined company's top three cu count for approximately 18% of revenue compared to 57% for the top three customers of DuPont Fabros on a standalone basis.

- **Development Pipeline Provides External Growth Potential:** DuPont Fabros' six data center development projects currently under construction are 48% pre-leased and represent a total expected investment of approximately $750 million, and amount to roughly a 26% expansion of its standalone critical load capacity. These projects are located in Ashburn, Chicago, Santa Clara and Toronto, all metro areas where Digital Realty has an existing presence. These six projects are expected to be delivered over the next 12 months, representing a solid pipeline of future growth potential. In addition, DuPont Fabros owns strategic land holdings in Ashburn and Oregon, which will support the future delivery of up to 163 megawatts of incremental capacity, along with 56 acres of land recently acquired in Phoenix.

- **Size and Scale Generate Incremental Benefits:** The two companies' operating models are highly complementary, and the combined organization is expected to provide the most comprehensive product offering in the data center sector. Given the enhanced size and scale, the combined company is also expected to have the most efficient cost structure and the highest EBITDA margin of any U.S.-based publicly-traded data center REIT.

- **Creates Substantial Anticipated Cost Efficiencies and Financial Benefits:** The combination of the two companies is expected to create an opportunity to realize up to $18 million of annualized overhead savings, resulting from both companies' complementary business operations. Upon closing, the transaction is expected to be immediately accretive to financial metrics, and is expected to further improve balance sheet strength.

"This strategic and complementary transaction significantly enhances Digital Realty's ability to support the growth of hyper-scale users in the top U.S. data center metro areas, while providing meaningful customer and geographic diversification for DuPont Fabros," said A. William Stein, Digital Realty's Chief

Executive Officer. "The combination is expected to generate both operating and financial benefits, and I'd like to congratulate Scott Peterson, Mark Walker and their team on successfully negotiating the largest tran believe will enhance our ability to create significant long-term value for both sets of shareholders."

We are excited to deliver this compelling transaction to our shareholders and execute upon two of the strategic objectives embodied in our corporate vision — diversifying our customer base and expanding our geographic presence," said Christopher P. Eldredge, DuPont Fabros' President & Chief ExecutiveOfficer. "As part of Digital Realty, our shareholders will continue to realize the benefits of our high-quality portfolio, with the added benefits of belonging to an even greater data center network with a truly global footprint and a well-diversified customer base. We also believe our shareholders will greatly benefit from Digital Realty's investment grade balance sheet and more attractive cost of capital. We look forward to working with the Digital Realty team over the coming months to close the transaction and bring our two companies together."

**Transaction Details**

The fixed exchange ratio represents a total enterprise value of approximately $7.6 billion, including $1.6 billion of assumed debt and excluding transaction costs. Digital Realty has obtained a fully committed bridge loan facility from BofA Merrill Lynch and Citigroup which will be available, if needed, to finance the transaction. The debt assumed in the transaction is expected to be permanently refinanced with a combination of investment grade corp bonds and other financings. The transaction has been unanimously approved by the boards of directors of both Digital Realty and DuPont Fabros.

The transaction is expected to close in the second half of 2017 and is subject to the approval of DuPont Fabros and Digital Realty shareholders and other customary closing conditions.

BofA Merrill Lynch and Citigroup are acting as financial advisors and Latham & Watkins LLP is acting as legal advisor to Digital Realty. Goldman Sachs & Co. LLC is acting as financial advisor and Hogan Lovells US LLP is acting as legal advisor to DuPont Fabros.

**D.    Deal Protection Devices**

38.    The Merger Agreement has a number of provisions that make it more difficult for another buyer to purchase the Company, and for the Company to seek out competing offers. Specifically, if the Company terminates the Proposed Transaction, the Merger Agreement states that the Company must pay Parent a termination fee of $150,000,000.

39.     Additionally, the Merger Agreement contains a strict no-solicitation provision, pursuant to which the Company is prohibited from soliciting competing acquisition proposals or, subject to certain exceptions regarding unsolicited proposals, engaging in discussions or providing information in connection with an alternative acquisition proposal.

40.     The Merger Agreement also contains an information rights provision that requires the Company to notify Parent of certain unsolicited competing offers and to provide Parent with information regarding such offers. In addition, the Merger Agreement grants Parent recurring and unlimited matching rights, which provide it with access to confidential, non-public information about competing proposals from third parties that it can use to prepare a matching bid and sufficient time to negotiate with Parent to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

41.     These provisions will cumulatively discourage other potential bidders from making a competing bid for the Company.  Similarly, these provisions make it more difficult for the Company and individual shareholders to exercise their rights and to obtain a fair price for the Company's shares.

**E.     The Materially Incomplete and Misleading Registration Statement**

42.     On July 10, 2017, in order to convince DuPont's stockholders to vote in favor of the Merger, the Individual Defendants authorized the filing of the Form S-4 Registration Statement with the SEC in connection with the Proposed Transaction (previously defined as the "Registration Statement").   As discussed below, the Registration Statement omits and/or misrepresents material information that must be disclosed to DuPont's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

**1.     Material Misstatements and/or Omissions Regarding the Sales Process**

43.     First, the Registration Statement fails to disclose certain material information

regarding the process that resulted in the Proposed Transaction. For example, the Registration Statement fails to disclose sufficient information regarding post-close employment opportunities for the Board and Company management, including the nature and circumstances of negotiations surrounding the same. This information is especially material in light of the great weight the Board gave post-close opportunities throughout the sale process.  Indeed, in negotiations with Parent, the Company repeatedly insisted on having at least three DuPont directors serve on a combined company board. And, as noted above, when a "difference in opinion" between the parties arose with respect to this issue, among other things, the Company went so far as to cease negotiations, turn off access to the virtual data room being used by Parent for due diligence, and deliver a "return or destroy" letter to Parent pursuant to the parties' confidentiality agreement. Registration Statement, 67, 69. As a result of this lack of information, DuPont shareholders are unable to properly assess the weight the Company afforded to post-close opportunities for the Board during the sale process. Registration Statement, 67-69.

44.     The Registration Statement similarly fails to disclose sufficient information regarding the negotiations regarding the Tax Protection Agreement to which DFT OP unit holders would be required to agree, including the specific nature of the disagreement over this issue and the specific terms at issue in the several Tax Protection Agreement term sheets that the parties exchanged.  This information is again especially relevant in light of the facts that (1) Defendant du Pont owns or has an economic interest in 3,335,648 common units of DFT OP, such that the tax treatment of these units would have been materially relevant to him, and (2) the Company went so far as to cease negotiations, turn off access to the virtual data room being used by Parent for due diligence, and deliver a "return or destroy" letter to Parent pursuant to the parties' confidentiality agreement when a disagreement arose regarding this and other issues. Registration Statement, 67, 69. As a result of this lack of information, DuPont shareholders are

unable to properly assess the weight the Company afforded to the terms of this Tax Protection Agreement during the sale process. Registration Statement, 67-69.

45.     In addition, the Registration Statement omits material information concerning the potential conflicts of interest faced by Goldman Sachs. Specifically, as noted above, in connection with the Proposed Transaction, an affiliate of Goldman Sachs entered into a commitment to provide DFT OP with a 364-day bridge facility, "pursuant to which one or more affiliates of Goldman Sachs will receive fees." Registration Statement, 101. However, the Registration Statement fails to disclose the amount of these fees, or any detail surrounding negotiation of the same, including the timing thereof. The omission of this information calls into question the independence of Goldman Sachs and, without it, DuPont's stockholders are unable to understand what incentives the Company's financial advisor had when performing its valuation analysis and evaluating strategic alternatives.

**2.      Material Misstatements and/or Omissions Regarding Goldman Sachs' Valuation Analyses**

46.     Second, the Registration Statement fails to disclose material key inputs and assumptions underlying the analyses conducted by Goldman Sachs.

47.     In connection with Goldman Sachs' *Discounted Cash Flow Analysis* for each of DuPont, Parent, and the pro forma combined company, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying the discount rates utilized in the analyses; (ii) the perpetuity growth rates utilized and the bases for their application; (iii) the terminal values calculated for each company; (iv) the estimates of net debt and preferred stock; (v) and the projected dividends that were utilized in deriving the terminal values. The omission of this material information renders the summary of Goldman Sachs' discounted cash flow analyses incomplete and misleading.

48.     In connection with each of Goldman Sachs' *Selected Transactions Analysis*, the

Registration Statement fails to disclose the individual multiples for each company and transaction that were utilized in the analyses. Registration Statement, 99. Without such information, DuPont's stockholders are unable to determine how the multiples used in determining DuPont's or Parent's value compare to the selected transactions. As a result, stockholders are unable to assess whether Goldman Sachs utilized unreasonably low multiples, thereby rendering the implied share price ranges set forth in the analyses misleading.

3.    **Material Misstatements and/or Omissions Regarding DuPont's Projections**

49.    Finally, the Registration Statement fails to provide sufficient information concerning the financial projections that were relied upon by the Board and by Goldman Sachs in performing its valuation analyses in connection with the Proposed Transaction.

50.    Specifically, the Registration Statement provides that, in performing its financial analyses, Goldman Sachs reviewed, among other things:

> certain internal financial analyses and forecasts for DFT [DePont] prepared by its management, and for DLR on a stand-alone basis prepared by its management, and certain financial analyses and forecasts for DLR on a pro forma basis for the transaction contemplated by the merger agreement prepared by the management of DFT with respect to the quarter ending June 30, 2017 and prepared by the management of DLR with respect to periods thereafter, in each case, as approved for Goldman Sachs' use by DFT (referred to as the "Forecasts"), including certain operating synergies projected by the management of DLR to result from the transaction contemplated by the merger agreement, as approved for Goldman Sachs' use by DFT (referred to as the "Synergies"). Registration Statement, 93.

51.    However, the only projections relied upon by Goldman Sachs in rendering its "fairness opinion" for which a summary is provided in the Registration Statement are the standalone projections for DuPont and DLR.  The Registration Statement fails to provide a summary of the pro forma "Forecasts" projections or the pro forma "Synergies" projections. These projections must be disclosed, especially in light of the facts that (1) Goldman Sachs specifically relied on them in performing its analyses in support of the Proposed Transaction and (2) the Common Merger Consideration is comprised entirely of Parent stock, such that the value

of the pro forma company on a going forward basis is plainly material to the value of the consideration that DuPont stockholders are receiving.

52.     With respect to the DuPont standalone projections that are actually disclosed, the Registration Statement provides only EBITDA, FFO per share, AFFO per share, and Unlevered Free Cash Flow line items – all of which are non-GAAP metrics – and fails to delineate the line item projections for the metrics utilized in calculating such metrics, or otherwise reconcile the non-GAAP projections to GAAP. Registration Statement, 107.

53.     When a Company discloses non-GAAP financial measures in a Registration Statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. By failing to disclose such information, the Registration Statement is materially misleading and in violation of Rule 14a-9 and SEC Regulation G, 17 C.F.R. 244.100.[1]

---

[1]     SEC Regulation G has two requirements: (1) a general disclosure requirement and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non- GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure...not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non- GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

Indeed, in recent months, the SEC has specifically begun to crack down on the widespread use of such non-GAAP financial measures in shareholder communications because such measures lack consistent definitions and are often inherently misleading. Mary Jo White, Chair of the SEC, specifically raised the issue in a June 27, 2016 keynote address, during which she stated:

> [O]ur rules governing these communications make clear that **the presentation of non-GAAP measures cannot be misleading and require that they be reconciled to the appropriate GAAP measure** so that investors and analysts can

54.     At minimum, Defendants must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP EBITDA and Unlevered Free Cash Flow metrics. Such information is necessary to make the non-GAAP projections included in the Registration Statement not misleading.

55.     The Registration Statement is materially incomplete and misleading because it omits the information identified above. Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and due care owed to Plaintiff and other public stockholders of DuPont.

## COUNT I

**On Behalf of Plaintiff and the Class Against
DuPont and the Individual Defendants for Violations of Section 14(a)
of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, among other things, the process that led to the Proposed Transaction, the

---

compare them to the one that is consistently defined under the GAAP requirements . . . . In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation . . . . [L]ast month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.

*Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

key inputs and assumptions of the financial analyses performed by Goldman Sachs in support of its fairness opinion, and the projections used by Goldman Sachs in support of its financial analyses.

58.     In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

59.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

60.     During the relevant period, Defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

61.     Specifically, and as detailed above, the Registration Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning certain material information regarding the process leading up to the consummation of the Merger Agreement, key inputs and assumptions underlying Goldman Sachs' financial analyses, and the projections used by Goldman Sachs in support of its financial analyses.

62.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Goldman Sachs reviewed its financial analyses with the Board and that the Board considered the financial analyses provided by Goldman Sachs in its fairness opinion.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.

63.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

64.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

65.     Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

66.     Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

<u>**COUNT II**</u>

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of DuPont within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of DuPont, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

71.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the

Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

74. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict. Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 31, 2017                                        Respectfully submitted,

                                                            **LEVI & KORSINSKY LLP**

                                                    By:     */s/ Donald J. Enright*
**OF COUNSEL:**                                             Donald J. Enright (#MD013551)
                                                            Elizabeth K. Tripodi (#979154)
**KAHN SWICK & FOTI, LLC**                                  1101 30th Street NW, Suite 115
Michael J. Palestina, Esq.                                  Washington, D.C. 20007
Christopher Tillotson, Esq.                                 Telephone: (202) 524-4290
206 Covington Street                                        Facsimile: (202) 333-2121
Madisonville, LA 70447
Tel.: (504) 455-1400                                        *Attorneys for Plaintiff*
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com

*Attorneys for Plaintiff*